**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| | ) |
| vs. | )    DOCKET NO. 2:95-cr-00029 |
| | ) |
| | ) |
| | ) |
| THOMAS BARTELHO | ) |
| | ) |

**MOTION TO REDUCE TERM OF IMPRISONMENT UNDER 18 U.S.C. § 3582(c)(1)(A)**

NOW COMES Defendant Thomas Bartelho, by and through undersigned counsel, and pursuant to 18 U.S.C. §3582(c)(1)(A), respectfully moves this Honorable Court to reduce his term of imprisonment. In support thereof, the defense states as follows:

**BACKGROUND**

**I.    PROCEDURAL HISTORY**

**a.   Underlying Case**

On May 16, 1995, a Grand Jury in the District of Maine returned a six count indictment charging Thomas Bartelho with three counts of Armed Bank Robbery in violation of 18 U.S.C. § 2113(a) (Counts One, Three, and Five); one count of Hobbs Act Robbery in violation of 18 U.S.C. § 1951 (Count Seven); and three counts of Use and Carrying of a Firearm in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c) (Counts Two, Four, and Six). *United States v. Bartelho,* Dkt. No. 2:95-cr-00029 (ECF No. 1).

Following an earlier mistrial, on November 9, 1995, a jury returned a guilty verdict against Mr. Bartelho on all counts. (ECF No. 61.) On March 1, 1996, Mr. Bartelho's sentencing hearing

1

was held. (ECF No. 181.) At that time, under 18 U.S.C. § 924(c), a defendant convicted of multiple counts in a single case faced increasingly severe mandatory minimum sentences—even in the absence of any prior final convictions under the statute. *Deal v. United States*, 508 U. S. 129, 132 (1993) (interpreting the recidivism-related language to require an enhanced penalty for each and every §924(c) count of conviction beyond a defendant's first—even if those convictions were part of the same criminal prosecution). Specifically, while the first § 924(c) conviction carried a five-year mandatory minimum, each subsequent conviction triggered a mandatory minimum of 20-years, all to be served consecutively.[1]

At sentencing, Judge Hornby made two alternative findings as to Mr. Bartelho's guideline: he first found Mr. Bartelho to be a career offender, thus yielding a total offense level of 34 with a criminal history category VI and an advisory guideline range of 262 to 327 months of incarceration. (ECF No. 181) at 40.  He alternatively found Mr. Bartelho to have a total offense level of 33 with a criminal history category VI, yielding an advisory guideline range of 235 to 293 months of incarceration. *Id*. Judge Hornby imposed a term of 278 months (23 years and 2 months) on Counts One, Three, Five, and Seven, to run concurrently. [2] He then imposed the statutorily required 45-year consecutive sentence on Counts Two, Four, and Six, pursuant to § 924(c). (ECF No. 181 at 45.) In total, Mr. Bartelho received a sentence of over 68 years of imprisonment.

---

[1] In 1984, Congress amended 18 U.S.C. §924(c) - which provides mandatory penalties for possessing a firearm in furtherance of a drug trafficking crime - as part of the Comprehensive Crime Control Act. In relevant part, it revised §924(c) so that "[i]n the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for ten years." Comprehensive Crime Control Act of 1984, Pub.L. No. 98-473, §1005(a), 98 Stat. 2138-2139.  In 1988, Congress amended §924(c) again, by replacing the 10-year sentence for a "second or subsequent conviction" with a 20-year sentence. Pub.L. No. 100-690, §6460, 102 Stat. 4373 (1988).

[2] Count Seven involved a conviction for Hobbs Act robbery in violation of 18 U.S.C. § 1951. The maximum statutory penalty for a violation of § 1951 is 20-years' imprisonment. 18 U.S.C. § 1951(a). Accordingly, the sentence imposed on Count Seven exceeded the statutory maximum.

Mr. Bartelho was 27 years old at the time of his offense of conviction and 29 years old at sentencing. *See* (ECF No. 191) at 44.

**b.  First Motion for Sentence Reduction/Modification**

In 2018, Congress passed the First Step Act. Pub. L. No. 115-391, 132 Stat. 5194. The First Step Act (hereinafter "FSA") reconfigured the statutory landscape for a number of offenses carrying mandatory minimum sentences. This included amending 18 U.S.C. § 924(c)'s stacking requirements to no longer required that Courts impose the 25-year stacked count when sentencing first time offenders.[3] 18 U.S.C. § 924(c); *Hewitt v. United States*, 606 U.S. 419, 424 (2025) (explaining that the statute as amended established that courts were not required to impose enhanced penalties for stacked sentences).

In addition to changes to certain mandatory minimum sentences, the FSA also amended the process for seeking compassionate release. Whereas previously, prisoners were dependent on the Bureau of Prisons to file a motion for their release with the court, as amended 18 U.S.C. §3582(c)(1)(A) permits prisoners to file their own motions after exhausting administrative remedies.  Pub. L. No. 115-391, 132 Stat. 5194 § 603(b); *United States v. Texeira-Nieves*, 23 F.4th 48, 52-53 (1st Cir. 2022).

On April 22, 2021, Mr. Bartelho filed a pro se Motion for Sentence Reduction/Modification pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 193). As a basis for relief, Mr. Bartelho cited to his 45-year mandatory minimum sentence – a sentence no longer required under current law. *Id*. In addition, Mr. Bartelho sought relief based on his underlying medical conditions and his increased risk in the event he was to contract Covid-19. *Id*. at 14-15.

---

[3] In 1998, Congress had again increased the mandatory minimum penalty for second or subsequent convictions under §924(c) from 20 to 25 years. Pub. L. No. 105– 386, 112 Stat. 3469 (1998).

Judge Hornby denied Mr. Bartelho's Motion on July 20, 2021. (ECF No. 202). In his Order, Judge Hornby commended Mr. Bartelho for the progress he had made in prison and wrote that he was "impressed" by letters of support submitted on Mr. Bartelho's behalf by other prisoners and his daughter. *Id*. at 3. However, at that time, the First Circuit had yet to address whether non-retroactive changes to mandatory minimums sentences could furnish a basis for a finding of extraordinary and compelling circumstances. *Id*. In the absence of guidance from controlling authority, Judge Hornby followed the reasoning of the Sixth and Seventh Circuits[4] and concluded that a non-retroactive change in sentencing law alone does not suffice; rather, a petitioner must first demonstrate extraordinary and compelling circumstances independent of the § 924(c) amendment. Applying that framework, Judge Hornby found that Mr. Bartelho's medical conditions, standing alone, did not meet the threshold required for relief. *Id*. at 3.

### c. Intervening Changes in Law.

Less than a year after Judge Hornby's Order, the First Circuit took up the issue of whether non-retroactive changes in sentencing laws could be a basis for request for a reduction in sentence in *United State v. Ruvalcaba*. 26 F.4th 14, 15 (1st Cir. 2022). In *Ruvalcaba,* the defendant sought compassionate release from a mandatory life sentence pursuant to 21 U.S.C. § 841(b)(1)(A) following his conviction for drug trafficking conspiracy. *Id*. at 16. At the time of his 2009 sentencing, conviction under that chapter with two prior drug convictions resulted in a mandatory life sentence. *Id*. at 17.

---

[4] *United States v. Thacker*, 4 F.4th 569 (7th Cir. 2021); *United States v. Jarvis*, 999 F.3d 442 (6th Cir. 2021)

However, like § 924(c), in 2018 through the FSA, Congress removed certain mandatory minimum penalties for drug offenses – lowering the mandatory minimum term for defendants convicted under the statute with two drug priors from life to 25 years.

In 2020, Mr. Ruvalcaba moved for compassionate release citing the substantial disparity in mandatory penalties from the time of his sentencing to today. *Id*. at 18. Like Judge Hornby, the district court held that non-retroactive changes in sentencing law, and any ensuing disparity could not constitute extraordinary and compelling circumstances. *Id*. On appeal, the First Circuit vacated the decision of the district court and remanded for reconsideration. *Id* at 16. It held that pending updated guidance from the Sentencing Commission, the district courts were no longer bound by the Sentencing Commission's policy statements in considering requests for compassionate release. *Id*. at 16, 21, 24. In *Ruvalcaba*, the First Circuit further held that courts "may consider the FSA's non-retroactive changes in sentencing law on an individualized basis, grounded in the defendant's particular circumstances, to determine whether an extraordinary and compelling reason exists for compassionate release." *Id*. at 16.

In April 2023, the Sentencing Commission regained a quorum.[5] On November 1, 2023, the Sentencing Commission updated its policy statements on motions for sentence reduction/modification thus making them applicable to prisoner-initiated motions. U.S.S.G §1B1.13. Under the new policy statements, extraordinary and compelling reasons to justify release include: certain medical circumstances such as a terminal illness or inability to receive medical care while incarcerated; the defendant's age; the defendant's family circumstances; if the defendant was the victim of sexual or physical abuse by or at the direction of a correctional officer;

---

[5] "'Back in Business' U.S. Sentencing Commission Acts to Make Communities Safer & Stronger," U.S. Sent'cing Comm. (Apr. 5, 2023) https://www.ussc.gov/about/news/press-releases/april-5-2023 (last accessed July 31, 2025).

a catch-all provision for any other reason or combination of reasons similar in gravity to those described in (1) through (4); and if the defendant received an unusually long sentence, *id*. at § 1B1.13(b)(1)-(6). With respect to the last basis – unusually long sentence - § 1B.13(b)(5) specifies that the defendant had to have received an unusually long sentence, served at least ten years of the term of imprisonment, and that a change may be considered but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed. *Id*.

On November 12, 2025, the Supreme Court heard oral argument in *Rutherford v. United States*. 24-829 (argued Nov. 12, 2025). Before the Court in *Rutherford*, is whether a district court may consider disparities created by the FSA's prospective changes in sentencing law to support a finding of extraordinary and compelling circumstances under § 3582(c)(1)(A). *Id*. There has been no decision as of the date of this filing.

## II.      MR. BARTELHO'S PERSONAL HISTORY AND BACKGROUND

At the time of Mr. Bartelho's sentencing, he elected not to participate in the presentence investigation interview. As such, at sentencing the Court did not have the benefit of his full background.

### a.   Mr. Bartelho's Early Childhood Was Shaped by Poverty, Domestic Violence at Home, and Organized Crime in His Community.

Mr. Bartelho was born in Portland, Maine in 1966. His father was a thoroughbred horse trainer. (ECF No. 203) at 2.  When Mr. Bartelho was five years old, the family relocated to Lincoln, Rhode Island.  *Def. Exh 1, Tracy Eller Ltr*. There, the family lived on an old dairy farm that they rented, that was located just five minutes from Lincoln Downs and ten minutes from Narragansett Park - two area racetracks. (ECF No. 203) at 3. From an early age, Mr. Bartelho's family was burdened by poverty. *Def. Exh. 1*. Unable to afford to put food on the table, Mr. Bartelho's father

would resort to stealing from the local grocery store. *Id*. He would steal with his children present. *Id*. When Mr. Bartelho was just nine years old, he was taken to the police station when his father was arrested for shoplifting. *Id*.  His mother and his sister had to come down to the police station to pick them both up. *Id*.

In addition to petty crimes, Mr. Bartelho's father could be a violent man. *Id*. Starting from a young age, both Mr. Bartelho and his little sister were witness to their father's physical abuse of their mother, who would frequently have bruises on her face. *Id*. As Mr. Bartelho got older, he also became a target for his father's beating. *Id*.

Lincoln, Rhode Island was located not far from the Federal Hill neighborhood of Providence, which at that time was home to the Patriarca Crime Family.[6]  From early childhood, Mr. Bartelho was raised in an environment where organized crime exercised pervasive control over the neighborhood and shaped community norms. *See* (ECF No. 203) at 3.  A code of silence was enforced through fear and violence. *Id*. The cautionary tales Mr. Bartelho was told as a young child included brutal murders of law enforcement informants in witness protection. *Id*. From a young age, Mr. Bartelho learned that crime was an accepted part of daily life and that cooperation with law enforcement carried grave consequences beyond the Government's ability to prevent.

When Mr. Bartelho was approximately ten years old, the family had to move from the farm. *Def. Exh. 1*. Mr. Bartelho's mother took the opportunity to flee – fearing for her life. *Id*. While she took Mr. Bartelho's little sister with her, she left Mr. Bartelho with his father. *Id*. Not long after, Mr. Bartelho's father kidnapped his little sister from her school.  *Id*. Mr. Bartelho, his father, and little sister moved to Foster, Rhode Island where they rented a home. *Id*.  The home had two rooms.

---

[6] Joseph Berger, *Raymond Patriarca, 76, Dies; New England Crime Figure*, NY Times (July 12, 1984) https://www.nytimes.com/1984/07/12/obituaries/raymond-patriarca-76-dies-new-england-crime-figure.html.

*Id*. The first they all slept in. *Id*.  The second, Mr. Bartelho's father used for illegal cock fighting. *Id*.

Surrounded by violence and instability, from a young age, Mr. Bartelho began to act out. *See id*.

### b. Mr. Bartelho's Early Entrance into the Criminal Justice System Further Set Him Off-Course.

Over the last two decades, there has been a precipitous drop in youth incarceration rates.[7] Advances in research on juvenile brain development have shifted public understandings of the most appropriate and effective response to juvenile delinquency. It is well accepted that the brain does not reach full maturity until 25 years of age.[8] Particularly, the area of adolescent brains dedicated to impulse control, weighing consequences, and regulating behavior are less developed than in the adult brain, thus making in more likely that adolescents will engage in risky and impulsive behaviors or be more susceptible to peer pressures. *Id*. However, these behaviors decline significantly with age. *Id*. Most youth naturally age out of crime.

However, studies have also shown that youth incarceration and the associated stress can impede this otherwise natural psychological development. *Id*. As a result, incarcerated youth develop psychosocial maturity at far slower rates than comparable peers who remain at home in the community. *Id*. In other words, rather than "rehabilitating," youth incarceration can have the opposite effect; hindering the very development most likely to curb future rule breaking. *Id*. at 20,

---

[7] *Youth Incarceration in the United States*, Annie E. Casey Foundation (Dec. 14, 2021) https://assets.aecf.org/m/resourcedoc/aecf-youthIncarcerationinfographic-2021.pdf (finding 70 percent drop-in youth confinement rates from 1995 to 2019).

[8] Richard Mendal, *Why Youth Incarceration Fails: An Updated Review of the Evidence*, The Sentencing Project, 20 (December 2022) https://www.sentencingproject.org/app/uploads/2023/03/Why-Youth-Incarceration-Fails.pdf (hereinafter "*Why Youth Incarceration Fails*").

14 (citing 2013 study finding correlation between length of incarceration and increase in recidivism rates). In addition to slowing development, youth incarceration can further upend existing support structures for youth including familial and community relationships, and school.

Particular practices, such as transfer of youth to adult facilities, have been shown to have a particularly deleterious effect. Children placed in adult facilities exhibit higher rates of depression, fear, and post-traumatic stress disorder. [9] They are also at greater risk for exposure to physical violence and victimization. *Id*. Experiencing childhood trauma, such as an assault, has similarly been shown to harm brain development and further heighten the risk for further delinquency and/or substance use disorders. [10] As explained by one 2016 journal article "[t]he trauma produced by incarceration may actually increase poor behavior, as youth struggle to cope with the emotional impact of confinement and to manage their subsequent externalizing behaviors." [11] Thus "[h]igher rates of incarceration may actually create more crime." *Id*. In recognition of the harmful

---

[9] Daniel C. Semenza, Ph.D. et al, *Youth Incarceration in Adult Facilities and Mental Health in Early Childhood*, Vol. 74 J. of Adolescent Health, 989, 990 (May 2024) 4https://www.sciencedirect.com/science/article/pii/S1054139X24000442

[10] Robert Kinscherff, Ph.d., J.D., *White Paper on the Science of Adolescence: A Guide for Judges, Attorneys, and Policy Makers*, Ctr. for L., Brain, and Behav., Mass. Gen. Hospital, 18 (Feb. 2, 2022) https://clbb.mgh.harvard.edu/wp-content/uploads/CLBB-White-Paper-on-the-Science-of-Late-Adolescence-3.pdf. (Maltreatment, chronic stress, and exposure to violence can negatively impact development, creating long-term changes in both brain and behavior. These neurobiological changes in adolescence can lead children and young adults to develop maladaptive coping mechanisms to stress and adversity, negatively impacting cognitive processes such as emotional regulation, impulsivity, and executive function.); *Why Youth Incarceration Fails* at 21; Substance Abuse and Mental Health Services Admin. Ctr. for the Application of Prevention Tech., *The Role of Adverse Childhood Experiences in Substance Misuse and Related Behavioral Health Problems*, (June 2018) https://mnprc.org/wp-content/uploads/2019/01/aces-behavioral-healthproblems.pdf (detailing multiple studies finding relationship between adverse childhood experiences and later health, social and behavioral problems including substance use disorders).

[11] *Why Youth Incarceration Fails* at 21

consequences of placement of children with adults, since 2007, eleven states have passed "raise the age" laws, prohibiting placement of children in adult facilities.[12]

As a young teenager, Mr. Bartelho started to act out and get into trouble. He was eventually charged with truancy and removed from the custody of his father. (ECF No. 203) at 4.  While initially placed at the Rhode Island Training School – the state's juvenile detention facility – he was subsequently transferred to a group home. Not long after that, Mr. Bartelho was remanded to the Rhode Island Training School until his 18th birthday after being charged with two counts of possession of stolen automobiles. *Presentence Investigation Report* (hereinafter "*PSR*") ¶ 66.

At age 16, Mr. Bartelho was charged with escape from the Rhode Island Training School. *PSR* ¶ 66.  This time, his case was referred for prosecution in the Rhode Island superior court. *See PSR* ¶ 66.  Upon information and belief, Mr. Bartelho was transferred to the adult correctional facility. (ECF No. 203) at 5.[13] While there, Mr. Bartelho fell in with a group of adult prisoners whom he recognized from his neighborhood, but until that time, had not previously known well. *Id*. This included one of the suspected co-defendants in the present case. *Id*.; *PSR* ¶ 14.

After he finished his sentence for escape, upon information and belief, Mr. Bartelho was transferred back to the Rhode Island Training School where he remained until his 18th birthday. *PSR* ¶ 66. Less than a month after his release, Mr. Bartelho was arrested again and charged with additional offenses including entering a dwelling without the owner's consent. *PSR* ¶¶ 66-77.

---

[12] Marcy Mistrett, *Bringing More Teens Home: Raising the Age Without Expanding Secure Confinement in the Youth Justice System*, The Sentencing Project (Jun. 25, 2021) https://www.sentencingproject.org/publications/bringing-more-teens-home-raising-the-agewithout-expanding-secure-confinement-in-the-youth-justice-system/.

[13] Due to their age, the defense was unable to obtain copies of Mr. Bartelho's juvenile incarceration record.

### III.   MR. BARTELHO'S REHABILITATIVE EFFORTS SINCE SENTENCING

As of date of this filing, Mr. Bartelho has served over 30 years of his sentence. During this time, Mr. Bartelho has participated in a multitude of rehabilitative programming as well as taken responsibility for his offense through participation in other programming.

### a.   Educational Programming.

As reflected in Defense Exhibit 2, since 1999, Mr. Bartelho has participated in numerous educational programs. *Def. Exh. 2, Transcript*. He has completed 75 different courses to date – nearly 400 hours of educational programming. *See Id*. His coursework has included classes on parenting, anger management, and planning for reentry to economics, earth science, and various history classes. *Id*. Mr. Bartelho is currently working towards completion of a class on Small Business Management. *Id*.  Mr. Bartelho participated in a 15-hour drug education program at USP Atwater, completed a course in Legal Research through the Community College of Rhode Island, and an additional course in Goal Setting at USP Atwater. *Def. Exh. 3, Drug Education Certificate; Def. Exh. 4, Legal Research Certificate; Def. Exh. 5, Goal Setting Certificate.*

In addition to these classes, in 2013, Mr. Bartelho actively sought to participate in the Non-Residential Drug Abuse Program. In his essay expressing his wish to participate in the program, Mr. Bartelho identified the close connection between his prior substance use and involvement in the justice system. *Def. Exh. 6, NRDAP Ltr*. In his 60-day progress review, Mr. Bartelho's counselor wrote:

> Mr. Bartelho stated, "I've learned so much from being in this program that it's amazing" He has come a long way since he has started this program. His communication skills and tolerance for others has increased and improved ten fold. He especially enjoyed the "Reviewing My Drug Use and Lifestyles Balance Journals." Despite his being held back, Bartelho is one of the very best at completing activities. His work ethic and drive to learn and change past behaviors is hard to match. In addition to the above completed activities, he completed the following on his own; Basic Cognitive Skills workbook, he wrote a paper on coping

11

skills to combat urges, Freedom from Drugs Workbook, and he wrote a paper on Breaking the Cycle of Addiction. In addition to the activities and work performed, he completes RSA's and Attitude Checks at the morning meeting in a very thorough and mistake free manner. He will continue to work on his treatment plan and progress will be reviewed in 60-days.

*Def. Exh.7, NRDAP Progress Review*. Mr. Bartelho successfully completed the six-month Non-Residential Drug Abuse Program on March 14, 2014. *Def. Exh. 8, NRDAP Completion Ltr*.

### IV.   MR. BARTELHO'S HEALTH

As of this filing, Mr. Bartelho is 59 years of age. *See PSR* Face Page (reflecting date of birth). Mr. Bartelho has back issues and suffers back pain, and at the time of his last Motion for Sentence Reduction/Modification was obese. (ECF No. 202) at 2-3.  He is subject to ongoing monitoring for cirrhosis of his liver. *Id,*

### V.   MR. BARTELHO'S RELEASE PLAN.

If granted release, Mr. Bartelho would return to New Jersey to live near his sister, Tracy Eller. Ms. Eller resides in the Cape May area of New Jersey. She is currently employed as a nurse. *Def. Exh. 1*. Ms. Eller's husband is a retired corrections officer. *Id*. With assistance from the Bureau of Prisons and his sister, Mr. Bartelho hopes to secure housing in the Cape May area. Ms. Eller is able and willing to assist Mr. Bartelho in his transition back to the community. *Id.*

Following his release, Mr. Bartelho will be subject to a term of supervised release. *See* (ECF No. 70). Among other conditions, Mr. Bartelho will be required to regularly report to a U.S Probation officer, not associate with any other individuals involved in criminal activity or with felony convictions, abstain from use of any controlled substances and intoxicants, participate in drug or alcohol treatment if instructed, submit to drug and alcohol testing, and upon reasonable suspicion that he has violated a condition of release, submit to search. *Id*. If Mr. Bartelho fails to comply with any of his conditions, he may be subject to arrest, and further incarceration.

## ARGUMENT

Title 18 U.S.C. § 3582(c)(1)(A) authorizes a sentencing court to reduce a term of imprisonment where a prisoner has exhausted their administrative remedies, and after considering the factors set forth in § 3553(a), the court finds extraordinary and compelling reasons warrant such a reduction, and such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).

To be eligible for a reduction in a term of imprisonment, a prisoner must meet four criteria: (1) that the defendant has exhausted administrative remedies; (2) that the defendant has presented extraordinary and compelling reasons warranting a sentence reduction; (3) the requested reduction is consistent with the applicable policy statements issued by the Sentencing Commission,  and (4) whether considering the applicable § 3553(a) factors a reduction is warranted. *Texeira-Nieves*, 23 F.4th at 55 (explaining criteria that must be met before a Court grants a sentence reduction in response to a prisoner-initiated motion for compassionate release); *United States v. Newton*, 2023 WL 8529442,*6 (D. Me. Dec. 8, 2023) ("18 U.S.C. § 3582(c)(1)(A) also requires any sentence reduction to be consistent with applicable policy statements issued by the Sentencing Commission.") (internal citation omitted).

I.      **MR. BARTELHO IS ELIGIBLE FOR A REDUCTION IN SENTENCE.**

**A.  Mr. Bartelho Has Exhausted his Administrative Remedies**.

Title 18 U.S.C. § 3582(c)(1)(A) as amended by the First Step Act of 2018, allows a Court, upon a motion of the defendant to grant compassionate release. 18 U.S.C. § 3582(c)(1)(A). The defendant may file this motion where they have exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or 30 days has elapsed

since the receipt of the defendant's request by the warden of the defendant's facility, whichever is earlier. *Id*.

On March 27, 2024, Mr. Bartelho submitted a request for sentence modification to the warden of USP Terre Haute. *Def. Exh. 11, First Request for Sentence Modification*. In his request, Mr. Bartelho cited to his unusually long sentence as a basis to support relief. *Id*. On March 28, 2024, Mr. Bartelho received a response from the Warden denying his request. *Id*.

On February 15, 2025, Mr. Bartelho was transferred to Tuscon FCI, arriving on March 28, 2025. On May 16, 2025, Mr. Bartelho submitted another request for sentence modification to the Warden of Tucson FCI.  *Def. Exh. 12, Second Request for Sentence Modification*. As a basis for his request, Mr. Bartelho cited his unusually long sentence, medical conditions, and participation in rehabilitative programming. *Id.* Mr. Bartelho received no response to the Motion. No motion for compassionate release was brought on his behalf.

Mr. Bartelho has exhausted his administrative remedies. As such he seeks relief from this Court.

### B. Mr. Bartelho's Unusually Long Sentence Constitutes Extraordinary and Compelling Reasons Warranting a Sentencing Reduction.

As noted above, in 2018, the First Step Act amended 18 U.S.C. § 924(c)(1), altering the application of enhanced mandatory minimums for what had previously been considered "second or subsequent" § 924(c)(1) offenses. Under the current law, these increased penalties apply only after a prior § 924(c)(1) conviction has become final. *See* 18 U.S.C. § 924(c)(1)(C) (2018). In other words, a defendant with no prior § 924(c)(1) convictions cannot be subject to enhanced mandatory minimums for multiple § 924(c) violations arising from the same prosecution.

As of March 2026, Mr. Bartelho has served 30 years of his sentence. If he were sentenced today under current law, the Court would only have been required to impose a 15-year, rather than

45-year, consecutive mandatory minimum sentence for his § 924(c) convictions. Had Mr. Bartelho received a 15-year, rather than 45-year, sentence on the three § 924(c) convictions, his total sentence would be 38 instead of 68 years—a gross disparity of 30 years.

     *i.*       *Backdrop of the First Step Act (FSA)*

The FSA corrected and clarified decades of unintended, unfair, harsh and inequitable results.

     1.   THE HISTORY OF §924(c) STACKING REQUIREMENT

Title 18 U.S.C. § 924(c) was proposed and enacted in a single day as an amendment to the Gun Control Act of 1986 – legislation that was spurred by the assassinations of Dr. Martin Luther King, Jr. and Robert F. Kennedy.[14] Because § 924(c) was a floor amendment, there were no congressional hearings or committee reports on its original purposes, and only a few statements made during floor debates are available. *Id.* As originally enacted, § 924(c) imposed a mandatory one-year sentence on any person that "uses a firearm" or "unlawfully carries a firearm" to commit or in the commission of "any felony for which he may be prosecuted in a court of the United States." *Id.*; *Simpson v. United States*, 435 U.S. 6, 7-8 (1978). If the person was convicted of a "second or subsequent" violation of § 924(c), the additional penalty was "not less than two years nor more than 25 years" to run consecutively with any other term of imprisonment imposed. *Id.*

In 1984, Congress amended 18 U.S.C. §924(c) as part of the Comprehensive Crime Control Act. In relevant part, it revised §924(c) so that "[i]n the case of his second or subsequent conviction

---

[14] *Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834, and H.R. 1466 Before the Subcomm. on Crime, Terrorism and Homeland Security of H. Comm. On the Judiciary*, 111th Cong. 61-62 (2009) (statement of Chief Judge Julie E. Carnes on behalf of the Judicial Conference of the United States) https://www.congress.gov/111/chrg/CHRG-111hhrg51013/CHRG-111hhrg51013.pdf. (hereinafter "Mandatory Minimums and Unintended Consequences Hearing")

under this subsection, such person shall be sentenced to imprisonment for ten years." Comprehensive Crime Control Act of 1984, Pub.L. No. 98-473, §1005(a), 98 Stat. 2138-2139.[15] In 1988, Congress amended § 924(c) yet again by replacing the 10-year sentence for a "second or subsequent conviction" with a 20-year sentence. Pub.L. No. 100-690, §6460, 102 Stat. 4373 (1988).

The marked increase in penalties for "second and subsequent" § 924(c) convictions, gave rise to litigation as to whether "second and subsequent" convictions, including convictions arising out of the same proceeding.[16] At issue primarily was whether Congress intended § 924(c) as a true recidivist statute. *Id*. According to the Judicial Conference at that time, most courts did not apply the 20-year penalty when the "second" conviction was just the second § 924(c) count in the indictment. *Id*. at 64.

In 1993, in *United States v. Deal*, the Supreme Court held that a defendant's second through sixth convictions under §924(c), all obtained in the same proceeding as his first, constituted "second or subsequent conviction[s]" within the meaning of that provision. 508 U.S. at 130-36. Following *Deal*, the practice of "924(c) stacking," where a defendant with no prior criminal record could be charged with multiple §924(c) counts in a single case and thereby face the mandatory minimum sentence for a second §924(c) conviction at his first sentencing proceeding became widespread. This interpretation fundamentally altered the understanding of §924(c) as a recidivism-based penalty.[17]

---

[15] In 1988, Congress amended §924(c) yet again by replacing the 10-year sentence for a "second or subsequent conviction" with a 20-year sentence. Pub.L. No. 100-690, §6460, 102 Stat. 4373 (1988).

[16] "Mandatory Minimums and Unintended Consequences" Hearing at 63.

[17] Congress increased the mandatory minimum penalty for second or subsequent convictions under §924(c) from 20 to 25 years. Pub. L. No. 105– 386, 112 Stat. 3469 (1998).

In the years that followed *Deal*, the practice of §924(c) stacking was vigorously criticized. On multiple occasions, the Judicial Conference of the United States urged Congress to amend the catastrophic penalties it produced.[18]  In urging Congress to do away with §924(c) stacking, the Judicial Conference explained that "the sentence resulting from stacking section 924(c) mandatory minimum penalties are 'greater by many years' than the guideline sentences for offenders who commit the most serious, violent crimes." *Id.* at 361. Similarly, in 2009, the Chair of the Criminal Law Committee of the Judicial Conference testified before Congress that § 924(c) stacking was so draconian that a first-time offenders who never fired a weapon but faced multiple § 924(c) counts could receive a sentence "greater by many years than the guideline sentence for an airline hijacker, a terrorist who detonates a bomb in a public place, or a hate crime in which the victim receives permanent injury."[19] The Judge concluded that "[t]here can be no persuasive justification" for the sentences produced by §924(c) stacking. *Id.* The Sentencing Commission also called upon Congress to "eliminate the 'stacking' requirement and amend 18 U.S.C. § 924(c) to give the sentencing court discretion to impose sentences for multiple violations of section 924(c) concurrently with each other."[20] Finally, since *Deal*, judges nationwide have soundly condemned the imposition of sentences they viewed as overly harsh and unjust. *United States v. Rivera-*

---

[18] *See* U.S. Sent'g Comm'n, *2011 Report To The Congress: Mandatory Minimum Penalties In The Federal Criminal Justice System* ("Mandatory Minimum Report") 360–61, n.904 (2011). https://www.ussc.gov/research/congressional-reports/2011-report-congressmandatory-minimum-penalties-federal-criminal-justice-system.

[19] *Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834, and H.R. 1466 Before the Subcomm. on Crime, Terrorism and Homeland Security of H. Comm. On the Judiciary*, 111th Cong. 35, 54 (2009) (statement of Chief Judge Julie E. Carnes on behalf of the Judicial Conference of the United States) https://www.congress.gov/111/chrg/CHRG-111hhrg51013/CHRG-111hhrg51013.pdf.

[20] *See* Mandatory Minimum Report at 368; *see also* U.S. Sent'g Comm'n, *Mandatory Minimum Penalties For Firearms Offenses In The Federal Criminal Justice System* 6 (2018).

*Ruperto*, 852 F. 3d 1, 31 (1st Cir. 2017)(Torreula, J., dissenting)(criticizing imposition of a 160-year sentence on a first time offender as draconian and the "unintended consequence of a statute hastily implemented and judicially altered.);  *United States v. Hungerford*, 465 F.3d 1113, 1118 (9th Cir. 2006) (Reinhardt, S., concurring) (characterizing 159-year sentence—almost all of which was attributable to § 924(c)—as "irrational, inhumane, and absurd" and "a predictable by-product of the cruel and unjust mandatory minimum sentencing scheme adopted by Congress"); *Hewitt v. United States*, 606 U.S. 419, 433-34 (2025) (noting that"[j]udges on the Federal Courts of Appeals ... 'join[ed] in the litany of criticisms directed towards' § 924(c)'s penalty regime for requiring the imposition of sentences that were 'out of this world'") (*quoting United States v. Hunter*, 770 F.3d 740, 746 (8th Cir. 2014))

        2.   <u>THROUGH THE FSA, CONGRESS ELIMINATED §924(c)'S DRACONIAN STACKING REQUIREMENT AND CLARIFIED IT WAS MEANT AS A TRUE RECIDIVIST STATUTE.</u>

In 2018, the FSA ended *Deal's* interpretation of the law. Section 403, titled "Clarification of Section 924(c)," rewrote that provision so that the enhanced mandatory sentences are mandated only by a §924(c) conviction that occurs after a prior such conviction has become final. The FSA thus terminated §924(c)'s draconian stacking provision. As one Court explained:

> Section 403 ... took the extraordinary step of outlawing the draconian practice of "stacking" § 924(c) convictions for sentencing purposes in a single prosecution. . . [I]t was an extraordinary development in American criminal jurisprudence. A modern-day dark ages — a period of prosecutorial § 924(c) windfall courts themselves were powerless to prevent — had come to an end. . . . [¶]The First Step Act of course did not make this critical change to § 924(c) retroactive . . . Nevertheless, Congress did label the relevant section of the legislation "*Clarification* of § 924(c)." The legal matter of retroactivity aside, the clear message to an individual in [defendant's] situation is that *Congress never intended that the brutal sentence he is serving be imposed.*"

*United States v. Haynes*, 456 F. Supp. 3d 496, 502 (E.D.N.Y 2020) (footnotes and citations omitted) (emphasis in original).

By titling § 403 as "Clarification," Congress indicated that the subsection was intended "to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases." *Brown v. Thompson*, 374 F.3d 253, 259-60 (4th Cir. 2004) (citation omitted). Further, the FSA's amendment to §924(c) is "not just any sentencing change, but an exceptionally dramatic one" because it eliminated a misuse of §924(c)'s recidivist enhancements that produced sentences that were decades longer "than what Congress has now deemed an adequate punishment for comparable . . . conduct." *United States v. McCoy*, 981 F.3d 271, 285 (4th Cir. 2020) (citation omitted). And, as the Ninth Circuit reasoned in *United States v. Lizarraras-Chacon*, such dramatic legislative changes represents a societal judgment that the previous sentencing regime was inconsistent with the goals of the criminal justice system. 14 F.4th 961, 967 (9th Cir. 2021).

Moreover, district courts should consider this unique history—which in some cases produced sentences of "extreme length . . . for a confluence of reasons that no legislator could have had in mind when § 924(c) was originally enacted"—in assessing whether a particular defendant's circumstances warrant a sentence reduction. *Ruvalcaba*, 26 F.4th at 31 (Barron, J., concurring). Indeed, since its passage, numerous courts have found the First Step Act's change in § 924(c) sentencing constitutes an extraordinary and compelling reason that can justify a reduction in an individual defendant's sentence under § 3582(c)(1)(A), including within this Circuit. *See, e.g., United States v. Rivera-Ruperto,* 3:10-cr-00344-SCC (D.P.R) (ECF Nos. 862-864) (reducing defendant's sentence from 1,942 to 228 months where parties stipulated that extraordinary and compelling circumstances existed based on Mr. Rivera Ruperto's individual circumstances, including the significant changes in the law, rehabilitation in prison, the punishment he has endured relative to that of similarly-situated defendants, and completion of an already significant period of incarceration); *United States v. Hernandez-Soto,* No. 3:10-CR-318-SCC (D.P.R. Mar. 8,

2023) (ECF No. 408); *see also United States v. Jackson,* 2025 U.S. Dist. LEXIS 86017, **31-32 (E.D. Cal. Mar. 30, 2025); *United States v. Parker*, 2021 WL 1966409 *2 (E.D. Cal. May 17, 2021) (where defendant's § 924(c) sentence would be decades shorter today under the FSA's clarification, "the Court finds this disparity to be an extraordinary and compelling reason for a sentence reduction."); *United States v. Arey*, 461 F. Supp. 3d 343, 349-50 (W.D. Va. 2020) (collecting cases); *Haynes*, 456 F. Supp. 3d at 514; *United States v. Urkevich*, 2019 U.S. Dist. LEXIS 197408, *9 (D. NE. Nov. 14, 2019) ("A reduction in his sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed."); *United States v. Nafkha*, 2021 U.S. Dist. LEXIS 5814 *11, 18, (D. Utah Jan. 8, 2021) (finding defendant's young age at the time of sentencing, the length of his sentence, and Congress's subsequent decision to amend § 924(c), considered together, establish extraordinary and compelling reasons for his compassionate release.); *United States v. McDonel*, 2021 U.S. Dist. LEXIS 6401, *11 (E.D. Mich. Jan. 13,  2021) (defendant who received § 924(c) stacked sentences was "eligible for compassionate release because of his harsh sentence — which would not be imposed under the law today — together with his youth and record of rehabilitation, discussed below…. his 107-year (1,285-month) sentence is extraordinarily long, and it appears particularly disproportionate when compared to average federal sentences for similar or more serious crimes."); *United States v. Duval*, 2022 WL 17551161, at *4-6 (D. Mont. Dec. 9, 2022) (reducing the defendant's sentence to time served based on the disparity between the defendant's sentence and the sentence he would have received following the passage of the First Step Act, as well the defendant's health); *United States v. Jones*, No. 94- 0441, 2022 WL 3139810, at *3-5 (D. Md. Aug. 4, 2022) (granting compassionate release motion despite the seriousness of the defendant's underlying offenses

because of the discontinuation of § 924(c) "stacking" as well as his youth at the time of the offense).

>    *ii.    Mr. Bartelho has demonstrated extraordinary and compelling circumstances through his excessively long sentence.*

As in the above cases, Mr. Bartelho was sentenced under a scheme that did not comport with Congressional intent regarding his § 924(c) offenses. His sentence is also out of step with current societal judgement as to an appropriate and just punishment for his offense.

The defense respectfully submits that the changes in the law considered alongside Mr. Bartelho's individual circumstances, represent extraordinary and compelling circumstances that merit a reduction in his sentence.

> **b.   Mr. Bartelho's Age, Health, and Participation in Rehabilitative Programs, When Considered Alongside the Other Factors, Further Support a Finding of Extraordinary and Compelling Circumstances.**

In evaluating a petitioner's request for release, where one proffered basis, alone, may be insufficient, where combined with other factors, in aggregate, may constitute extraordinary and compelling circumstances. *United States v. Trenkler*, 47 F.4th 42, 49 (1st Cir. 2022) ("After all, it is possible that the whole may be greater than the sum of its parts, and reasons that might not do the trick on their own may combine to constitute circumstances that warrant a finding that the reasons proposed are, in the aggregate, extraordinary and compelling.").

Mr. Bartelho understands that by statute, rehabilitation alone, cannot provide a basis for a reduction in his sentence. 28 U.S.C. § 994(t).  He further acknowledges that currently, his health and age are insufficient on their own to support the finding of extraordinary and compelling circumstances. However, Mr. Bartelho submits that these factors, when considered alongside his unusually long sentence, further support the finding of extraordinary and compelling circumstances warranting a reduction in sentence.

21

### i. Rehabilitation

As detailed *infra*, Mr. Bartelho has participated in a number of rehabilitation programs – addressing issues from anger management and substance use disorder, to job skills development. In addition to demonstrating Mr. Bartelho's desire for change, these programs will assist him in readiness to renter the community and for long term success.

In addition to participating in programming, Mr. Bartelho's friends and family can attest to his personal change. In his prior Motion for Compassionate Release, Mr. Bartelho submitted letters of support, including from fellow inmates describing his positive impact on the community. (ECF No. 193-1) at 11 (letter from Aryan Harris explaining the change and remorse she has observed in Mr. Bartelho); 18 (letter from Steven Hillard describing Mr. Bartelho's positive impact on the prison community and detailing an incident where Mr. Bartelho saved his life).

Adding to his previous letters of support, as detailed in Defendant. Exhibit 1, Mr. Bartelho's sister, Ms. Eller has also witnessed a change in him. *Def. Exh. 1*. This has included letting go of the long-held anger about his childhood and reflecting on the broader impact of his choices on his family. *Id*.

### ii. Age and health

Across the country, prisons and jails have increasingly struggled to meet the needs of their rapidly aging population.[21] Today, individuals over the age of 50 are the fastest growing population at the Bureau of Prisons, accounting for 20 percent of the inmate population.[22]

---

[21] *See* Inimai Chettiar, *At America's Expense: The Mass Incarceration of the Elderly*, Am. Civil Liberties Union, (Jun. 2012) https://www.aclu.org/files/assets/elderlyprisonreport_20120613_1.pdf.

[22] Federal Bureau of Prisons, *Inmate Age*, https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (accessed Aug. 19, 2025).

Prisons have struggled to keep up with the rising cost of aging inmate medical care. This cost is driven not only by increased frequency of medical visits for aging prisoners, but money spent on medications, and the cost of staff time and resources spent transporting prisoners to outside medical facilities.[23] Several studies, including by the American Journal of Public Health, have found that due to a combination of stresses associated with incarceration and conditions individuals were exposed to prior to their incarceration, inmates' physiological age averages 10 to 15 years older than their chronological age – only further compounding this problem.[24]

In addition to increased cost to housing and providing medical care to aging inmates,[25] there are substantial challenges to housing inmates in the prison environment. Built primarily with security and safety in mind, many facilities lack appropriate infrastructure to accommodate the needs of aging inmates. A 2015 Report by the Office of the Inspector General found overcrowding at Bureau of Prisons facilities limited the prison's ability to guarantee lower bunk assignments to aging inmates and that many areas in facilities lacked handicap-accessible hallways, doors, and cells. *Id*. at 23-28. The Report also found that external infrastructure present in many facilities, such as narrow sidewalks and uneven terrain created additional unsafe conditions for aging

---

[23] Off. of the Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Dep't. of Just. i-ii (May 2015) https://oig.justice.gov/reports/2015/e1505.pdf .

[24] *Id*. at 1 (citing B. Williams, et al., "*Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*," Am. J. of Public Health 102, 1475–1481 (Aug. 2012)

[25] According to the Report by the Office of the Inspector General in FY 2013, the average aging inmate cost $24,538 to incarcerate, whereas the average younger inmate cost $22,676. The review found this differential was driven by increased medical needs, including the cost of medication, for aging inmates. *Id*. at ii. Further, Bureau of Prison institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than institutions with the lowest percentage of aging inmates ($1,916). *Id*. Bureau of Prison institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49). *Id*.

inmates. *Id*. at 29. Beyond deficiencies in physical infrastructure, the Office of Inspector General Report found the Bureau of Prisons lacked appropriate staffing and staff training to meet the growing needs of its aging inmate population. This included insufficient staffing to assist elderly inmates in navigating the prison facility, accompany prisoners to medical trips – resulting in delayed care – and inadequate staff training in recognizing the signs of aging. *Id*. at 18-20.

While Mr. Bartelho is currently able to function in the prison environment, there is no doubt this will change with time as he continues to age. A reduction in sentence, will allow Mr. Bartelho to return to the community with time left to work and support himself. It will also allow him time to establish medical care with providers in his community to support both his long- and short-term health.

II.     **The § 3553(a) Sentencing Factors Militate in Favor of Reducing Mr. Bartelho's Sentence.**

       i.     *Nature and circumstance of the offense (§3553(a)(1)) and need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment (§3553(a)(2)(A)-(B))*

The sentence imposed for Mr. Bartelho's offense is three decades longer than the sentence that would be required to be imposed if he were to be sentenced today.

> Subsequent developments affecting a mandatory minimum are relevant, for example, to the 'nature and circumstances of the offense,' the 'seriousness of the offense,' the needs 'to provide just punishment for the offense,' and 'to afford adequate deterrence to criminal conduct.' § 3553(a)(1), (2)(A)-(B). The 'seriousness of the offense,' is broad and logically includes any subsequent reevaluation of sentencing issues reflected in legislation. Subsequent legislation, such as the reduction of the mandatory minimum in the First Step Act, is a legislative reassessment of the relative seriousness of the offense. Legislative changes or guideline changes do not happen in a vacuum. They represent a societal judgment that it is necessary, from time to time, to reconsider and adjust what is an appropriate sentence consistent with the goals of the criminal justice system. Congress's legislative action through the First Step Act, reducing the mandatory minimum and requiring a higher-level predicate offense reflects a decision that prior sentences were greater than necessary.

24

*Lizarraras-Chacon*, 14 F.4th at 967. The FSA represents Congressional judgment that a mandatory minimum of 15 years – rather than 45 years – is a sufficient but not greater than necessary punishment for Mr. Bartelho's offense.

There is no question that Mr. Bartelho committed a very serious offense. However, Mr. Bartelho has already served a very long sentence - by any metric. The sentence Mr. Bartelho has served is already 11 years longer than his only charged co-defendant. *See United States v. Van Bever*, 2:94-cr-00061 (reflecting total of 228-month sentence imposed). The over three decades Mr. Bartelho will have spent behind bars is more than sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

ii.      *History and characteristics of the defendant (§3553(a)(1))*

As discussed above, Mr. Bartelho's childhood was marred by early exposure to violence at home and in his community. In place of substantive intervention, Mr. Bartelho was instead placed in the juvenile justice system. The juvenile justice system, in turn, funneled Mr. Bartelho directly into the adult criminal justice system.

In this case, beyond just stymie Mr. Bartelho's natural brain development, his early experience in the criminal justice system acted as a form of crime school – directly facilitating his introduction to individuals who would go on to become his future co-defendants. Not surprisingly, Mr. Bartelho was not rehabilitated at the time of his exit from the juvenile justice system. As reflected in his PSR, nine of Mr. Bartelho's criminal history points came from convictions he obtained before he was even 20 years old. PSR ¶¶ 67-69.

"The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age." U.S.S.G. § 5H1.1. (2024).  It is similarly well-

25

documented that an individual's likelihood of recidivating drops precipitously with their age.[26] A study of recidivism rates of federal offenders released in 2005, found that those over the age of 65 at the time of release had a rearrest rate of just 13.4 percent compared to 67.6 percent of offenders younger than age 21 at the time of release. *Id*. at 3. Another 2015 study by the Office of the Inspector General of 381 inmates over the age of 50 released from Bureau of Prison custody between 2006 and 2010 found no re-arrests for released inmates age 70 or older.[27]

Mr. Bartelho is now 59 years old. During his over 30 decades behind bars, he has matured. He has worked hard to overcome his traumatic childhood and to understand the root causes of his previous behavior. This change is reflected not only in observations from family members, but also in Mr. Bartelho distancing himself from the negative influences of his past.

> iii.    *The need for the sentence imposed to protect the public from further crimes of the defendant. (§3553(a)(2)(C))*

For the reasons stated above, the thirty years that Mr. Bartelho has served in prison is more than sufficient to achieve the goals of deterrence. Furthermore, as explained above, Mr. Bartelho is not the same person he was at the time of the offense three decades ago.

Mr. Bartelho also understands that if this Motion is granted, he will still be subject to a term of supervised release. In addition to assisting Mr. Bartelho in his transition back to the community, this supervision will also ensure that Mr. Bartelho keeps his life on track and is

---

[26] U.S. Sent'g Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, 10 (Dec. 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/ 2017/20171207_Recidivism-Age.pdf.

[27] Office of the Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, U.S. Dep't Just. 39-40 (May 2015) https://ohn.fd.org/sites/ohn/files/Inspector%20General%20Report%20on%20BOP%20Problems%20with%20Aging%20Population%206May2015.pdf

accountable. If he fails to follow the rules, Mr. Bartelho understands he risks arrest and return to incarceration.

> iv.   *The need for the sentence imposed to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. (§3553(a)(2)(D))*

"A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life." *United States v. Carvajal*, No. 04 CR 222AKH, 2005 WL 476125, at *6 (S.D.N.Y. Feb. 22, 2005).  As explained above, Mr. Bartelho has participated in extensive programming during his time at Bureau of Prisons. However, now is the time for him to expand upon this work in the community. Mr. Bartelho's sister is prepared to assist him in his transition home and connecting him to supports. This includes helping him acclimate to life on the outside. This also includes helping to connect him to housing resources and in finding a job so that Mr. Bartelho can work in the remaining years he has left to do so.

With respect to Mr. Bartelho's health, as explained above, as he ages, he is only going to have increased medical needs. This care is most appropriately provided to him in the community.

## CONCLUSION

WHEREFORE, Mr. Bartelho respectfully requests this Court grant his Motion and reduce his term of imprisonment.

Dated May 27, 2026, in Portland Maine

/s/ Grainne Dunne_____
Grainne Dunne
Attorney for Defendant
Assistant Federal Defender
P.O. Box 595
Portland, Me 04112-0595
207-553-7070
FAX: 553-7017
grainne_dunne@fd.org

27

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**


**CERTIFICATE OF SERVICE**

I, Grainne Dunne, attorney for Thomas Bartelho hereby certify that I have served electronically, a copy of the within **MOTION TO REDUCE TERM OF IMPRISONMENT UNDER U.S.C. § 3582(c)(1)(A)** to be served upon Assistant United States Attorney Todd Lowell, Esq., via the ECF system.

Dated May 27, 2026                     */s/ Grainne Dunne*
                                        Grainne Dunne